No. 20-35904

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

YONAS FIKRE,

*Plaintiff-Appellant,*

v.

FEDERAL BUREAU OF INVESTIGATION, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Oregon

## BRIEF OF APPELLANT YONAS FIKRE

March 26, 2021

Lena F. Masri
Gadeir I. Abbas
Justin Sadowsky
CAIR LEGAL DEFENSE FUND
453 New Jersey Ave. SE
Washington, DC 20003
(202) 742-6420

*Counsel for Yonas Fikre*

*Gadeir I. Abbas licensed to practice
in Virginia only. Practice limited
to federal matters*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................ 1

STATUTORY AUTHORITIES.................................................................. 1

STATEMENT OF ISSUES...................................................................... 2

INTRODUCTION..................................................................................... 3

STATEMENT OF THE CASE ................................................................ 4

   I.  Fikre is placed on the No Fly List, tortured, surveilled, and arrested ....................................................................................... 4

   II.  Fikre brings this lawsuit and the Government removes him from the watchlist in response....................................................... 7

   III.  This Court holds no mootness absent conceding Fikre's placement on the No Fly List was inappropriate and adding procedural safeguards to prevent new placement ................................. 8

   IV.  The District Court finds mootness after the Government refuses to vindicate Fikre but claims that it would not place him back given "currently available information." ........................................ 9

SUMMARY OF ARGUMENT ................................................................ 11

STANDARD OF REVIEW..................................................................... 13

ARGUMENT ......................................................................................... 13

   I.  Fikre's travel-related claims are not moot ..................................... 13

     A.  The circumstances of Fikre's removal do not establish that the Government will refrain from the challenged conduct in the future 15

        1.  There are no procedural safeguards insulating the change from reversal............................................................................. 15

        2.  The Government's failure to provide a rationale for its change in behavior likewise precludes a finding of mootness................... 20

     B.  The Government's voluntary cessation does not moot his travel related claims because removal does not eradicate the effects of the alleged violation ................................................................ 24

1.  Mootness and standing are two different doctrines with two different tests ..................................................................25

2.  The District Court's treatment of this as simply part of the stigma-related Due Process test was in error ...............................26

II.  Fikre's stigma-related Due Process claims are valid ....................27

    A.  Fikre was stigmatized by watchlist placement. ..........................28

    B.  Indeed, this Court has already recognized that Fikre was stigmatized...............................................................................32

        1.  There is a plus, because the watchlist took away Fikre's constitutional rights.........................................................34

        2.  The watchlist altered Fikre's status in concrete ways. ............38

        3.  Fikre has met any required connection between the stigma and the loss of status ..........................................................39

CONCLUSION ........................................................................41

CERTIFICATE OF COMPLIANCE..........................................................43

# TABLE OF AUTHORITIES

<u>Cases</u>

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972)............................................27

*Bell v. City of Boise*, 709 F.3d 890 (9th Cir. 2013)...................................17

*Clark v. Township of Falls*, 890 F.2d 611 (3d Cir. 1989)............32, 34, 36

*Conset Corporation v. CSA*, 655 F.2d 1291 (D.C. Cir. 1981).................33

*County of Los Angeles v. Davis*, 440 U.S. 625 (1979)..............................24

*Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) ......................................27

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,* 196 F.3d 958 (9th Cir. 1999) ......................................................................................17

*Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 55 (2d Cir. 2001) ..27, .........................................................................................................35

*Doe v. DOJ*, 753 F.2d 1092 (D.C. Cir. 1985) ..........................................33

*El Ali v. Barr,* 473 F. Supp. 3d 479, 497 (D. Md. 2020).........................36

*Elhady v. Kable*, 391 F. Supp. 3d 562 (E.D. Va. 2019)......... 18, 31, 36, 41

*Ellis v. Railway Clerks*, 466 U.S. 435 (1984) ..........................................26

*Fikre v. Fed. Bureau of Investigation*, 904 F.3d 1033 (9th Cir. 2018) ............................................................................................. passim

*Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006).................21

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000) ......................................................................................... 14, 25, 26

*Hart v. Parks*, 450 F.3d 1059 (9th Cir. 2006) .........................................27

*Humphries v. Los Angeles*, 554 F.3d 1170 (9th Cir. 2009) ............. passim

*Ibrahim v. Dept. of Homeland Sec.*, 669 F.3d 983 (9th Cir. 2012. .........26

*Ibrahim v. DHS*, 912 F.3d 1147 (9th Cir. 2019) .....................................16

*Jones v. Los Angeles Community College Dist.*, 702 F.2d 203 (9th Cir.1983) ...............................................................................................39

*Knox v. SEIU, Loc. 1000*, 567 U.S. 298 (2012).................................14, 25

*Latif v. Holder*, 28 F. Supp. 3d 1134 (D. Or. 2014)...........................16, 35

*Los Angeles v. Humphries*, 562 U.S. 29 (2010) ......................................27

*Matthews v. Harney County, Or., Sch. Dist. No.* 4, 819 F.2d 889 (9th Cir. 1987)..................................................................................................39

*McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015)............................19

*Miller v. Reed*, 176 F.3d 1202 (9th Cir. 1999)........................................13

*Mohamed v. Holder*, 11-cv-50, 2015 WL 4394958 (E.D. Va. July 16, 2015) ..............................................................................................28

*Mohamed v. Holder,* 266 F. Supp. 3d 868 (E.D. Va. 2017).....................13

*Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001) ...................................................................................33

*Natl. Council of Resistance of Iran v. Dept. of State*, 251 F.3d 192 (D.C. Cir. 2001) ...................................................................................37

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260 (9th Cir. 1998)..............................................................................20, 23

*Olagues v. Russoniello*, 770 F.2d 791 (9th Cir. 1985).......................20, 23

*Paul v. Davis*, 424 U.S. 693 (1976) .......................................27, 33, 38, 39

*Porter v. Bowen*, 496 F.3d 1009 (9th Cir. 2007)....................................20

*Rosebrock v. Mathis*, 745 F.3d 963 (9th Cir. 2014)................................15

*Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169 (9th Cir. 2009)...12

*Sefick v. Gardner*, 164 F.3d 370 (7th Cir.1998) ....................................17

*Shirvinski v. U.S. Coast Guard*, 673 F.3d 308 (4th Cir. 2012) .............33

*Siegert v. Gilley,* 500 U.S. 226, (1991).....................................................35

*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293 (9th Cir.1998) .............12

*Suarez Corp. Industries v. McGraw,* 202 F.3d 676 (4th Cir. 2000)........35

*Tarhuni v. Holder*, 8 F. Supp. 3d 1253 (D. Or. 2014) ............................30

*Tebo v. Tebo,* 550 F.3d 492 (5th Cir. 2008) ................................32, 34, 36

U. S. v. Brandau, 578 F.3d 1064 (9th Cir. 2009) ....................................16

## United States Constitution

U.S. Constitution , Article III, Section 2......................................................1

## Federal Rules

Fed. R. of App. P. 4(a)(1)(B). ......................................................................1

## Statutes

28 U.S.C. § 1291, ........................................................................................1

28 U.S.C. §§ 1331, 2201, 2202...................................................................1

5 U.S.C. § 702. .............................................................................................1

iv

Regulations

CBP Directive 3340-049A § 5.1.4;....................................................34, 36

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this case, a challenge to the federal government's unconstitutional watchlist, under 28 U.S.C. §§ 1331, 2201, 2202, and 5 U.S.C. § 702. Venue in the District of Oregon was proper under 28 U.S.C. § 1391 because Defendants-Appellees include the United States and agencies of the United States, because Oregon is the judicial district where Fikre resides, and because a substantial part of the events or omissions giving rise to the claims occurred in Oregon. The District Court entered a final judgment on August 12, 2020. Fikre filed a notice of appeal on October 9, 2020. Appellate jurisdiction is thus proper under 28 U.S.C. § 1291 and Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATUTORY AUTHORITIES

Article III, Section 2, of the U.S. Constitution states, in relevant part:

> The judicial power shall extend to all cases, in law and equity, arising under this Constitution….

The Fifth Amendment of the U.S. Constitution states, in relevant part,

> No person shall … be deprived of life, liberty, or property, without due process of law.

1

## STATEMENT OF ISSUES

1. Did the Government make it absolutely clear that Fikre's No Fly List placement would not reoccur when it asserted it would not in a nonbinding declaration to the District Court but made neither any changes in its policies or procedures nor provided any rationale at all for the change in position?

2. Did the Government eliminate all relief that Fikre is entitled to in bringing his travel-related Due Process claims when it not only refused to "acknowledge … that its investigation revealed Fikre did not belong on the list" but expressly reasserted that Fikre did previously belong on the list?

3. Was Fikre stigmatized under the Supreme Court's stigma-plus doctrine when, as a result of the Government's actions placing him on the No Fly List, he was declared a terrorist, imprisoned and tortured at the behest of the US government, refused permission to board any aircraft, charged with terrorism, lost his constitutionally-protected right of privacy in his communications, and was pressured by the Government to act as an informant in violation of his sincerely-held religious beliefs?

## INTRODUCTION

The federal government's terror watchlist has forced life-altering consequences on Yonas Fikre, who has been placed upon the terrorist watchlist and its famous sublist, the No Fly List. Accused of being a terrorist—without any disclosed evidence or due process—Fikre has been tortured, exiled from his own country, forced to seek asylum, and denied boarding on flights. He has had his private communications intercepted, been arrested and indicted, and has been denied the ability to participate in the religious commandment of *hajj*.

The District Court below accepted that the Government's actions, as alleged, infringed upon his constitutional right to due process. Still, the District Court dismissed Fikre's travel-related Due Process claim as moot. But this Court has previously held that Fikre's claims are not moot unless the Government not only removed Fikre from the No Fly List but did so in a way that both provided procedural safeguards that would protect Fikre from being replaced on the No Fly List, **and** acknowledged upon investigation that Fikre did not belong on the list, would this case be moot. Here, the Government's mere, unexplained assertion that Fikre has been removed from the No Fly List and will not be replaced on the

3

list based on "currently available information," whatever that means, does not cut it. And it particularly does not cut it when the Government simultaneously doubles down and claim that Fikre did, in fact, previously belong on the No Fly List.

Meanwhile, the District Court dismissed Fikre's stigma-plus Due Process claims. While the District Court correctly acknowledged that Fikre's stigma-plus Due Process claim was not moot, it incorrectly held that Fikre had not suffered a sufficient "plus" injury under this Circuit's stigma-plus jurisprudence. But a "plus" is just any tangible burden on the ability to obtain a right or status. And Fikre has shown that burden in a variety of ways, including on his ability to board an aircraft unmolested (or indeed at all), to communicate privately, and to remain free from torture and indictment.

The Court of Appeals should reverse the District Court's dismissals and remand the case for discovery.

## STATEMENT OF THE CASE

### I.    Fikre is placed on the No Fly List, tortured, surveilled, and arrested

Yonas Fikre came to the United States from his native Eritrea as a child, and is now a United States citizen. ER-33 at ¶ 51. Fikre moved to

4

Portland, Oregon in 2006, where he worked for a cellular telephone company. *Id.* ¶ 52. In late 2009, Fikre decided to use his experience in the cellular telephone industry to pursue the business of distributing and selling consumer electronic products in Sudan. *Id.*

In April 2010, while still in Sudan, Fikre was approached by two FBI agents who questioned him about his association with the as-Saber Mosque in Portland and his commercial finances. ER-35-36 at ¶¶ 56-58. The agents told Fikre that he had been placed on the No Fly List, which not only prohibits one from flying to, from, or in the United States, but also causes a host of travel and non-travel based consequences for the listed individual. *Id.* at ¶ *58*. The FBI agents offered to remove Fikre from the list if he became a government informant. *Id.* at ¶ 59. Fikre refused. ER-38 at ¶ 62.

That September, Fikre traveled on business to the United Arab Emirates. ER-39 at ¶ 68. While there, UAE police arrested, imprisoned, and tortured Fikre for 106 days. ER-39-45 at ¶ 69-79. During this time, Fikre was interrogated about his connection to the as-Saber Mosque and the nature of his financial dealings. ER-43 at ¶ 78. One of the interrogators told Fikre that the FBI had requested his detention. ER-45 at ¶ 88.

5

Fikre was ultimately released from UAE prison, but he was unable to board a plane bound for the United States because he remained on the No Fly List. *Id* at ¶ 89. Fikre sought refuge in Sweden. *Id* at ¶ 90. While in Sweden, Fikre both applied for asylum in Sweden and sought modification of his No Fly Status through DHS TRIP, DHS's redress procedure for travel-related issues. ER-47 at ¶ 97; 48 at ¶ 99. Meanwhile, the Government was surveilling Fikre and intercepting his private communications. ER-50 ¶ 107. Ultimately, the United States Attorney's Office for the Southern District of California indicted him for "conspiracy to structure" monetary transfers from his family to him in the UAE. *Id.* That indictment was based at least in part on information the United States obtained from Fikre's 106 days of interrogation and torture in the UAE, and from the Government's subsequent electronic surveillance. *Id.* at ¶¶ 98,110.

Still in Sweden, Fikre brought this lawsuit against the Government in 2013. Shortly thereafter, the Government dismissed its indictment of Fikre without any trial, diversion, or plea. *Id.* at ¶ 107. Then, in 2015, DHS informed Fikre that he was and would remain on the No Fly List because he had been "identified as an individual who may be a threat to

6

civil aviation or national security." ER-49-50 ¶ 104. No other reasons were provided for the decision to maintain Fikre on the No Fly List. Later that same year, Sweden denied Fikre asylum, and returned him to the United States. *Id*. at ¶ 105.

## II.    Fikre brings this lawsuit and the Government removes him from the watchlist in response

As mentioned above, Fikre brought this case in 2013 while still seeking asylum in Sweden. ER-69 at Dkt. 1. This lawsuit was still at the Motion to Dismiss stage (which it has yet to move past seven years later) in 2016, when the Government announced that it had removed Fikre from the No Fly List. ER-24. The Government provided no explanation for why it had removed Fikre, nor did it suggest in any way that Fikre never belonged on the No Fly List.

Based on the notice, the Government moved to dismiss Fikre's case as moot. *Id*. In response, Fikre conceded that his claim for an injunction seeking his removal from the No Fly List was moot, but maintained his claim for Declaratory Relief that his placement on the No Fly List was consistent with the US Constitution was still properly before the Court. ER-19. Fikre also argued his claims related to the broader terrorism screening database that the No Fly List was just a part of also remained

before the Court. ER-20. The District Court ruled against Fikre and found his claims moot, dismissing the lawsuit. ER-4.

## III. This Court holds no mootness absent conceding Fikre's placement on the No Fly List was inappropriate and adding procedural safeguards to prevent new placement

Fikre appealed and this Court reversed. The Court held that "a voluntary change in official stance or behavior moots an action only when it is 'absolutely clear' to the court, considering the 'procedural safeguards' insulating the new state of affairs from arbitrary reversal and the government's rationale for its changed practice(s), that the activity complained of will not reoccur." *Fikre v. Fed. Bureau of Investigation*, 904 F.3d 1033, 1039 (9th Cir. 2018) (citations omitted). The Government must meet this burden to overcome the voluntary cessation to mootness exception. *Id*. "Even accepting the government's argument that its notice [of Fikre's removal from the No Fly List] constitutes a 'formal agency action, publicly made, and unequivocally expressed,' the mere announcement that Fikre was removed from the list falls short of meeting the government's burden." *Id*.

This Court separately held that even apart from the voluntary exception to mootness, Fikre's claim was not moot. "Fikre's removal from

the No Fly List does not completely and irrevocably eradicate the effects of the alleged violation." *Id.* at 1040 (cleaned up). "Absent an acknowledgment by the government that its investigation revealed Fikre did not belong on the list … Fikre remains … stigmatized as a known or suspected terrorist and as an individual who represents a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so." 904 F.3d at 1040 (cleaned up). Without this vindication, "acquaintances, business associates, and perhaps even family members are likely to persist in shunning or avoiding him despite his renewed ability to travel," creating harm that confers standing. *Id.*

## IV.    The District Court finds mootness after the Government refuses to vindicate Fikre but claims that it would not place him back given "currently available information."

In response to this Court's decision, FBI Supervisory Special Agent Christopher Courtright made a declaration to the Court. ER-65. Other than authenticating a "Watchlisting Overview" document and recounting that Fikre was removed from the No Fly List in May 2016, all the Courtright Declaration stated was that (1) Fikre was "placed on the No Fly List in accordance with applicable polices and procedures," (2) Fikre "was removed from the No Fly List upon the determination that he no

9

longer satisfied the criteria placement on the No Fly List," and that (3) Fikre "will not be placed on the No Fly List in the future based on the currently available information." ER-66 at ¶ 5.

The District Court ruled from the bench at oral argument that this declaration mooted Fikre's travel-related claims, but that Fikre's stigma-related claims may persist. ER-4. The District Court held that, because "the reputational harm" from being placed on the No Fly List "continues out into the future," any stigma-related injury was not affected by the Courtright Declaration. ER-5. The District Court further found that stigma-related harm was not properly described in the Complaint. ER-9-10. So, the District Court dismissed the travel-related Due Process claims with prejudice for mootness, and the stigma-related Due Process claims without prejudice in order to allow Fikre to replead. ER-4.

After an amended complaint and another round of briefing, the District Court ruled that Fikre did not suffer stigma-plus-related injury under the Due Process Clause and dismissed Fikre's remaining stigma-related Due Process claim with prejudice. ER-11.[1]

Fikre now once again appeals to this Court.

## SUMMARY OF ARGUMENT

Fikre's travel-related claims are not moot. Although the Government took Fikre off the No Fly List, they have not made it absolutely clear that the conduct will not reoccur as they have neither shown any procedural safeguards sufficient to avoid being placed back on the No Fly List nor explained to the Court and to Fikre what has changed—other than the pendency of this litigation—to make him not covered by the amorphous standard for placement on the watchlist going forward. This is what this Court previously held was necessary to allow the Government's voluntary cessation to moot this case. Thus, the Government's voluntary cessation does not moot Fikre's claims.

---

[1] In its decision, the District Court suggests that Fikre "has disavowed that his 2016 reputational injury caused the deprivation of a right." ER-10. But Fikre's disavowal was more modest, explaining at oral argument below that Fikre was "limiting the plus factors that we're identifying [to] government conduct." ER-16.

11

Separately, Fikre's travel-related claims are not moot because Fikre can still get relief in this case by obtaining a vindicating statement that he is not a terrorist and does not or did not belong on the No Fly List or the broader terrorism screening database. As this Court has held, the lack of vindication is independent grounds for Fikre's case not being moot even if the Government could meet its burden under voluntary cessation.

Fikre has also validly stated a stigma-plus due process claim. As the District Court correctly held, Fikre's being placed on a terrorist watchlist and being declared a terrorist by the Government is inherently stigmatizing. Despite the District Court's conclusion otherwise, Fikre has also shown a "plus" factor sufficient to remove his case from one of ordinary defamation and into one covered by the Due Process Clause. That "plus" factor must only be a tangible burden on a legal right or status. Fikre has shown that plus in a variety of ways, including his lack of ability to board an aircraft unmolested (or indeed at all), protect his communications from interception, participate in hajj, not to mention his torture and later arrest and indictment.

12

## STANDARD OF REVIEW

The Court of Appeals reviews de novo a dismissal for both mootness and a dismissal for failure to state a claim. *Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1172 (9th Cir. 2009); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998).

## ARGUMENT

## I.    **Fikre's travel-related claims are not moot**

When Fikre filed this case, he did so because the Government had imposed a flight ban on Fikre that prevented him from traveling by air. This flight ban lasted for years, violating Fikre's rights to interstate and international travel—both guaranteed by procedural and substantive due process.[2]

In the aftermath of the Government's decision to remove Fikre from the No Fly List, this Court held that the "voluntary cessation doctrine applies" to Fikre's travel-related claims and that judicial relief remains

---

[2] *See Fikre*, 904 F.3d at 1036 ("the right to international travel [is] a protected right under substantive due process."); *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) ("The Supreme Court has recognized a fundamental right to interstate travel."): *Mohamed v. Holder,* 266 F. Supp. 3d 868, 880 (E.D. Va. 2017) ("placement on the No Fly List does far more than "significantly discourage" designees from traveling; it often absolutely bars them from so doing and effectively precludes them from engaging in a wide range of constitutionally protected activities").

available to Fikre "absent an acknowledgement by the government that…Fikre did not belong on the list." *Fikre,* 904 F.3d at 1040. After remand, the Government never provided such an acknowledgment, which the district court—in an unwritten decision announced from the bench after oral argument—chose to overlook as the lower court disregarded this Court's application of the voluntary cessation doctrine.

In doing so, the district court misplaced the burden of proving mootness. That heavy burden is on the Government. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 170 (2000). It requires a showing that, given the change in circumstances, "it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. SEIU, Loc. 1000*, 567 U.S. 298, 307 (2012) (cleaned up) (citations omitted) (cleaned up). The Government's burden also requires a showing that "the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth*, 528 U.S. at 189. This Court previously found that the Government did not meet this heavy burden, and it should do so once again for the same reasons.

14

### A. The circumstances of Fikre's removal do not establish that the Government will refrain from the challenged conduct in the future

This Court held that "a voluntary change in official stance or behavior moots an action only when it is 'absolutely clear' to the court, considering the 'procedural safeguards' insulating the new state of affairs from arbitrary reversal and the government's rationale for its changed practice(s), that the activity complained of will not reoccur." *Fikre*, 904 F.3d at 1039 (citations omitted). In determining whether Government action qualifies, the Court looks, among other things, to "the form the governmental action takes" and "the avowed rationale for governmental action." *Id.* at 1038.

### 1. There are no procedural safeguards insulating the change from reversal.

The Courtright Declaration does not get the Government out from under this Court's decision that the "voluntary cessation doctrine applies" to Fikre's claims. *Fikre,* 904 F.3d at 1041. There is a reason this Court demanded that the Government institute "procedural safeguards" prohibiting "arbitrary reversal." *Id.* at 1039. *See Rosebrock v. Mathis*, 745 F.3d 963, 974 (9th Cir. 2014) (the absence of procedural safeguards preventing a party from flip-flopping is "a factor that countenances against

15

mootness."). Courtwright's declaration has no binding or legal effect. It is not an enforceable contract and creates no "hurdles to reinstating Fikre on the No Fly List." *Id.* at 1041.

The declaration actually does the opposite. Through the Courtright Declaration, the Government defends what it did to Fikre, proclaiming that he "was placed on the No Fly List in accordance with applicable policies and procedures." ER-65. As this Court explained three years ago, the Government's failure to "repudiate[e] the decision to add Fikre to the No Fly List" stands in the Government's way of proving its "acquiescence to the righteousness of Fikre's contentions." *Id.* at 1040. What was true last time this case was before the Ninth Circuit remains true today: "vindication in this action would have actual and palpable consequences for Fikre." *Id.*

And history shows that when it comes to the Terrorism Screening Database and the No Fly List, merely taking someone off the list—even with the understanding that person should not be on it—is not a permanent affair. In *Ibrahim v. DHS*, 912 F.3d 1147 (9th Cir. 2019), this Court recounted how an FBI agent accidentally put a Stanford graduate student who indisputably was not a security risk on the No Fly List, and

then for the next decade the Government repeatedly kept re-adding her and her daughter to the list each time the error was caught and one of them removed, and then refused to disclose the comedy of errors to the Court. *Id.* at 1164; *see also Latif v. Holder*, 28 F. Supp. 3d 1134, 1155-56 (D. Or. 2014). As this Court noted in *U. S. v. Brandau*, the "rapid re-promulgation" of a voluntarily-mooted challenged policy tends to show the challenge to that policy is not moot. 578 F.3d 1064, 1069 (9th Cir. 2009). Likewise, the fact that taking someone's name off the watchlist is "not implemented by statute or regulation and could be changed again," further counsels against mootness. *Bell v. City of Boise*, 709 F.3d 890, 901 (9th Cir. 2013) (quoting *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,* 196 F.3d 958, 963 n. 1 (9th Cir. 1999)), and *Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir.1998)).

Courtright's "currently available information" assertion does not enhance the Government's argument. *Fikre*, 904 F.3d at 1039. What the Government means when it refers to "currently available information" and what changes might alter the Government's determination is left to complete speculation. The only information the Government offers about

17

Fikre's No Fly List placement—that he had been "identified as an individual who may be a threat to civil aviation or national security"—is the kind of boilerplate, contentless recitation of a standard that courts disregard at the motion to dismiss stage.

Neither the district court nor this Court know why the Government put Fikre on the No Fly List, declined to change his status in response to DHS TRIP complaints in 2013 and 2015, and then decided out of the blue to remove him "two months after [district court] briefing was completed." *Id.* at 1040. Much like last time, this Court is left "with no explanation of the reasons [the Government had] for dropping Fikre from the No Fly List." *Id.* And without this information, this Court cannot consider the Courtright Declaration's "currently available information" assertion an "avowed rationale for governmental action" capable of supporting the Government's efforts to meet its mootness burden. *Id* at 1038.

On the contrary, what is known about the No Fly List and the watchlist more generally confirms the arbitrary manner in which the Government wields it. The Government can place people on the No Fly List because of their participation in innocent and even constitutionally-protected conduct; there is no requirement that the Government must

suspect listees of criminal wrongdoing. *See Elhady v. Kable*, 391 F. Supp. 3d 562, 581 (E.D. Va. 2019) (Government claims an authority to place individuals on watchlist for innocent and constitutionally-protected reasons).

And, in this case, the Complaint sets out how the Government put Fikre on the No Fly List—not because he was a security threat—but as a means of coercing him to become an informant. ER-36-38. Given these allegations and the Government's refusal to explain why Fikre was placed and then removed from the No Fly List, it is impossible to know whether Courtright's "currently available information" includes something more than arbitrary information. This inscrutable assertion is not a "procedural safeguard."

Thus, given his five-year history on the No Fly List, the Government's propensity to remove Americans on the No Fly List only after the prospect of an adverse court decision becomes real, and the various strands of the Government's startling behavior in this case, Fikre is reasonably concerned that once this lawsuit ends, the Government's "currently available information" will change in tandem, and Fikre's watchlist status will change for the worse. As this Court explained: "As far as

19

we can tell, the current permission Fikre has to travel by air is 'discretionary,' and not 'entrenched' or 'permanent.'" *Fikre*, 904 F.3d at 1040 (quoting *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015). The secrecy the Government insists upon here supports the application of the voluntary cessation doctrine.

>    **2.    The Government's failure to provide a rationale for its change in behavior likewise precludes a finding of mootness**

As this Court explained in the prior *Fikre* decision, the Ninth Circuit "also examine[s] the avowed rationale for governmental action when assessing the merits of a claim of voluntary cessation." *Fikre*, *id.* at 1038. Thus, in *Olagues v. Russoniello*, 770 F.2d 791 (9th Cir. 1985), abandonment of a federal investigation into illegal voter registration by noncitizens did not moot the plaintiffs' suit when "the United States Attorney did not voluntarily cease the challenged activity because he felt that the investigation was improper" and "ha[d] at all times continued to argue vigorously that his actions were lawful." *Id.* at 795. The mere fact the Government found further investigation no longer viable under present circumstances did nothing to moot the case. *Id. see also Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1274 (9th Cir. 1998) (the

20

discontinuance of syphilis tests on employees "merely for reasons of 'cost-effectiveness'" did not moot the case because the laboratory did not "offer[] any reason why they might not return in the future to their original views on the utility of mandatory testing" and therefore did not rule out that testing might be employed again); *Porter v. Bowen*, 496 F.3d 1009, 1016–17 (9th Cir. 2007) (letter from California Secretary of State to the California legislature tolerating the operation of vote- swapping websites pending clarification of state election code did not moot lawsuit because "the Secretary has maintained throughout the nearly seven years of litigation . . . that [her predecessor] had the authority under state law to threaten [plaintiffs] with prosecution"); *Forest Guardians v. Johanns*, 450 F.3d 455, 460, 462 (9th Cir. 2006) (Forest Service's practice of not monitoring utilization levels of grazed allotment likely to persist despite interim monitoring because the agency "argued throughout th[e] litigation that it is not required to meet [those monitoring requirements]").

The Courtright Declaration is insufficient evidence that the challenged conduct will not reoccur. The declaration does not indicate that any new facts or any change in policy prompted Fikre's changed No Fly

List status. To Fikre's knowledge, the only material change in the Government's "currently available information" relates to the pendency of this lawsuit. This Court made this observation in the first Fikre decision: "This record suggests that Fikre's removal from the No Fly List was more likely an exercise of discretion than a decision arising from a broad change in agency policy or procedure." *Fikre*, 904 F.3d at 1040. The new "currently available information" statement from Courtright does not "assure[] Fikre that he will not be banned from flying for the same reasons that prompted the government to add him to the list in the first place," since it is no more clear what that initial information is or what has now changed. *Id.* Nor does the Courtright Declaration "verif[y] the implementation of procedural safeguards conditioning its ability to revise Fikre's status on the receipt of new information." *Id.*

Further, the Government refuses to change, or even disclose, its watchlisting policies. It is entirely possible that Fikre is no longer on the No Fly List because the Government's "currently available information" includes a temporary change in watchlist policy relating to Fikre alone, which permitted the removal of Fikre but will revert back to his inclusion if and when this case is dismissed. The point is, the Government has not

given Fikre or the Court any context to judge what its representation means. Without providing more detail as to what "currently available information" constitutes, the Courtright Declaration provides no more information than this Court already had the last time this case was before it, other than that the Government now defends the propriety of its decision to place Fikre on the watchlist in the first instance.

And, on top of this, the Courtright Declaration is not binding. It is simply a vague assertion of the Government's current, completely reversible position, right now. That is why this Court made clear in this case that "an executive action that is not governed by any clear or codified procedures cannot moot a claim." *Fikre*, 904 F.3d at 1038. Even with this declaration to the Court, there are no "'procedural safeguards' insulating the new state of affairs from arbitrary reversal." *Id.* at 1039.

Of course, even if the Government did provide the reason for Fikre's removal, it would remain unable to meet the exacting burden required by Ninth Circuit caselaw and this Court previously. That little we do know because the Courtright Declaration aims to vindicate, not Fikre's claims, but rather the Government's decision to put Fikre on the No Fly List by declaring that it was done "in accordance with applicable policies and

23

procedures." ER-65. Because the Government expressly declines to "re-pudiat[e] the decision to add Fikre to the No Fly List," this Court need not reconsider its prior decision in this case.

The Government's secret reasons —at best—are analogous to situations this Court addressed in *Olagues* and *Norman-Bloodsaw*, where the defendant continued to defend its conduct but merely relented for supposedly unrelated bureaucratic or evidentiary reasons which are both legally (because the Courtright Declaration is not binding) and expressly ("based on currently available information," whatever that means) not set in stone.

**B.    The Government's voluntary cessation does not moot his travel related claims because removal does not eradicate the effects of the alleged violation**

This Court separately held that Fikre's case would not be moot unless and until "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Fikre*, 904 F.3d at 1037 (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). "[R]emoval from the No Fly List" alone fails to accomplish this eradication. *Id.* at 1040. Only "an acknowledgment by the government that its investigation revealed Fikre did not belong on the list, and that he will

24

not be returned to the list based on the currently available evidence" can eliminate the stigma caused by the Government's labeling of Fikre a terrorist and placement of him on the No Fly List. *Id.*

As the District Court held with respect to Fikre's stigma-plus claim, ER-4, the Courtright Declaration does not completely and irrevocably eradicate the effects of the injury. Of course. The Government pointedly refused to provide the vindication that would be necessary to restore Fikre's standing in the community. ER-4; *Fikre*, 904 F.3d at 1038 & 1040.

Where the District Court erred is finding Fikre's travel-related claims moot. ER-10. The District Court's rationale appears to be that because vindication relates to stigmatization and not to travel, the failure to alleviate the stigmatization is irrelevant to whether the travel-related claims are moot. ER-10. But this conflates Fikre's duty of showing the quantum of harm required to show travel-related injury for standing in the first instance and the Government's different burden for showing that a case where standing existed has since become moot.

### 1. Mootness and standing are two different doctrines with two different tests

Mootness is not "standing set in a time frame." *Friends of the Earth*, 528 U.S. at 189. Instead, "there are circumstances in which the prospect

that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Id.* at 190. While standing requires a "concrete stake" in the outcome of the case when it is brought, mootness is essentially a policy judgment, asking whether "abandonment of the case" due to changed circumstances would be more "wasteful than frugal." *Id.* at 191-92. An interest that is insufficient to bring a case in the first instance by itself may nonetheless be sufficient to maintain the case against a mootness challenge. *Knox*, 567 U.S. at 307–08 ("as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot") (quoting *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984)).

> ### 2. The District Court's treatment of this as simply part of the stigma-related Due Process test was in error

The question before the District Court was not whether the stigma the Government's No Fly List decision imposed on Fikre was sufficient to give him standing to invoke his travel-related Due Process claims. The fact that he was prohibited outright from flying domestically and internationally for more than five years is what gives him standing to assert this claim. *See Ibrahim v. Dept. of Homeland Sec.*, 669 F.3d 983, 994 (9th

Cir. 2012. The question instead was that, given his removal and the Courtright Declaration, did Fikre still have a sufficient stake in the outcome to ensure that any decision was the result of an adversarial process. *Friends of the Earth*, 528 U.S. at 191-92. That question does not turn in any way on the Court's stigma-plus test (discussed in Section II, below). Rather, it instead turns on the factors listed in this Court's prior *Fikre* decision. Those factors show that Fikre's travel-related claims in this case are not moot for the same reasons the District Court held that Fikre's stigma-plus claims are not moot.

## II.     Fikre's stigma-related Due Process claims are valid

A person has certain rights with respect to governmental defamation that alters or extinguishes a right or status previously recognized by state law, under a test known as the "stigma-plus" test. *Paul v. Davis*, 424 U.S. 693, 711 (1976). In order to make a stigma-plus claim, the challenged government conduct must be stigmatizing (the stigma) and must be done "in connection with the denial of a 'more tangible' interest," (the plus). *Hart v. Parks*, 450 F.3d 1059, 1069 (9th Cir. 2006) (cleaned up).

A stigmatizing statement is any statement that "might seriously damage [the plaintiff's] standing and associations in his community." *Bd.*

*of Regents v. Roth*, 408 U.S. 564, 573 (1972). "The "plus" factor can be any "tangible burden on a legal right." *Humphries v. Los Angeles*, 554 F.3d 1170, 1188 (9th Cir. 2009), *as amended* (Jan. 30, 2009*), rev'd on other grounds sub nom. Los Angeles v. Humphries*, 562 U.S. 29 (2010); *see also Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 55 (2d Cir. 2001) *rev'd on other grounds, Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 123 (2003).

### A. Fikre was stigmatized by watchlist placement.

The District Court held that Fikre was stigmatized by watchlist placement. ER-6-7. "Fikre has plausibly alleged that Defendants have stigmatized him as a suspected terrorist (or, at least, a dangerous person) by subjecting him to intensive, repeated, non-random security screenings in front of members of his community and family during his 2016 Mecca and San Diego trips." ER-6. This is correct.

As explained in *Mohamed v. Holder*, 11-cv-50, 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015), "a person's placement on the No Fly List would likely become known over time to persons beyond government agencies or the airlines, with accompanying adverse consequences visited upon a restricted person." This is exactly how the Government's decision to list him has played out in Fikre's life; the Seventh Amended Complaint

is replete with allegations that Fikre's No-Fly status became known to relatives, friends, and business associates, sometimes in humiliating ways. *See, e.g.*, ER-38 at ¶ 60; 47 at ¶ 98; 49 at 101-102; 52-53 at ¶¶ 114-147. Placement on the No-Fly List even led to his divorce from his wife. ER-49 at ¶ 101-102.

In 2016, when Fikre traveled with others in his faith community to Mecca for the once-in-a-lifetime religious pilgrimage known in Islam as hajj, his fellow congregants "stopped speaking with him and sought to avoid any contact with him" in response to the "visible consequences of Fikre's TSDB status." ER-53-54 at ¶¶ 119-121. Because of his TSDB status, which persisted after his removal from the No Fly List, he was "made an outcast in his hajj group." ER-55 at ¶ 127.

Later in the year, Fikre was humiliated in front of his wife when, because of his watchlist status, Defendants "patted down [Fikre and his wife's] 11 month old baby, touching every part of the infant's body." ER-58 at ¶ 142. And this was not the end of it for Fikre. During this same family trip, as Fikre approached the gate for his flight, he separated himself from his wife and young child, because he "understood that if they boarded the plane together Defendants would cause the entire family to

be screened again." ER-59 at ¶ 145. The Government assigned Fikre a status that caused him humiliation each time he has traveled by air since the Government removed him from the No Fly List.

And all this ignores the most critically stigmatizing effect at all. The UAE imprisoned and tortured Fikre for 106 days because of the Government's placement of Fikre on the No Fly List and its decision to broadcast to the UAE that Fikre was a suspected terrorist. ER-40-45 at ¶¶ 68-89. The Government suggests that Fikre concedes that "the Government played no role" in "his alleged extended detention in the UAE," suggesting it was Fikre's own fault for "voluntary travel to UAE to pursue business opportunities." ER-25 at n.7. But Fikre makes clear that the Government placed him on the No Fly List "in order to coerce Plaintiff into becoming an informant/agent provocateur for the FBI," and when he refused, "Defendants retaliated by instigating and facilitating imprisonment, assault, and torture at the hands of the UAE government during the summer of 2011." ER-28 at ¶ 2. Fikre's torture (not just "alleged extended detention" per the Government's minimization) was a direct, proximate, and intended result of the Government placing him on the No Fly List.

The Government's claim of lack of stigma below focused on *Tarhuni v. Holder*, 8 F. Supp. 3d 1253, 1275 (D. Or. 2014). But in *Tarhuni*, the only disclosure alleged was to Air France and Alaska Airlines. *Id.* at 1274. Here, the allegations were far more public, with far worse consequences.

This Complaint explains how his No Fly List status became public, both because Fikre's could not hide, from his family or from his friends, the reasons for his inability to board a plane back to the United States, just as he was compelled by circumstance to advocate in a visible way against Defendants after his torture and detention in UAE. See ER-39-48 at ¶¶ 68-99. The Complaint explains, even after Defendants removed him from the No Fly List, the visible consequences of his TSDB status made it clear to the dozens with whom Fikre traveled to Mecca that Defendants had listed him. ER-52-57 at ¶¶ 114-135. "Fikre's co-travelers did not want to serve him food or water and looked at Fikre with fear and disgust." ER-56 at ¶ 133.

### B. Indeed, this Court has already recognized that Fikre was stigmatized

As this Court noted in its prior decision, "Fikre remains, in his own words, 'stigmatiz[ed] … as a known or suspected terrorist and as an individual who represents a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.'" *Fikre*, 904 F.3d at 1040. "Because acquaintances, business associates, and perhaps even family members are likely to persist in shunning or avoiding him despite his renewed ability to travel, ***it is plain*** that vindication in this action would have actual and palpable consequences for Fikre." *Id.* (emphasis added). *See also Elhady,* 391 F. Supp. 3d at 580 ("the FBI shares an individual's TSDB status with over 18,000 state, local, county, city, university and college, tribal, and federal law enforcement agencies and approximately 533 private entities…[which] would reasonably be expected to affect any interaction an individual on the Watchlist has with law enforcement agencies and private entities that use TSDB information to screen individuals they encounter in traffic stops, field interviews, house visits, municipal permit processes, firearm purchases, certain licensing applications, and other scenarios"). Fikre has suffered a "plus" factor. To satisfy the plus prong, a party must show some "tangible burden" on the

"ability to obtain a right or status" or that a right or status was "altered or extinguished." *Humphries*, 554 F.3d at 1188. This includes the deprivation of any "right previously existing under state law or the U.S. Constitution." *Tebo v. Tebo,* 550 F.3d 492, 504 (5th Cir. 2008); *see Clark v. Township of Falls*, 890 F.2d 611, 619 (3d Cir. 1989) (similar). The mere consulting of the list in question prior to providing the right or status qualifies: "[A] tangible burden also exists where the plaintiff can show that, as a practical matter, the law creates a framework under which agencies reflexively check the stigmatizing listing—whether by internal regulation or custom—prior to conferring a legal right or benefit." *Humphries*, 554 F.3d at 1188.

The "statutory impediments to buying alcohol, opening or maintaining bank accounts, or receiving material support from other people," qualify as plusses. *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001). Also qualifying is a "loss of tax exemption." *Paul*, 424 U.S. at 705. Likewise, the right to be considered for government contracts qualifies. *Doe v. DOJ*, 753 F.2d 1092, 1109 (D.C. Cir. 1985) (citing *Conset Corporation v. CSA*, 655 F.2d 1291 (D.C. Cir. 1981)); *see also Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 316 (4th Cir. 2012).

33

Here, Fikre meets the plus factor.

### 1. There is a plus, because the watchlist took away Fikre's constitutional rights.

The TSDB is designed to impose adverse legal consequences on lis-
tees, each of which also qualifies as a plus. As explained by the Com-
plaintt, TSDB Listees, whether bearing the No Fly List annotation or not,
are also subjected to intensive scrutiny by the Government as a matter
of TSDB encounter policy. ER-32 at ¶ 35. This includes the Government:

- subjecting TSDB Listees to lengthy and onerous secondary
  screening at airports;

- subjecting TSDB Listees to lengthy and onerous secondary in-
  spection at land borders;

- subjecting TSDB Listees to the mandatory search and copying of
  their electronic devices at borders;

- subjecting TSDB Listees to handling codes requiring their arrest
  or other adverse treatment during any encounter with federal,
  state, local, or private law enforcement officers;

- barring TSDB Listees from access to employment or credentials
  across federal agencies and public and private infrastructure in-
  dustries; and

- subjecting TSDB Listees' traveling companions, relatives, and
  other associates to comparable scrutiny.

*Id.*; *see also* CBP Directive 3340-049A § 5.1.4; *Tebo*, 550 F.3d at 504 (loss of constitutional right qualifies); *Clark*, 890 F.2d at 619 (same); *Humphries*, 554 F.3d at 1188-89 (checking for right or status against the list qualifies as burden for stigma-plus purposes, even if a deprivation is not mandatory).

While the loss of one's constitutional rights, as well as one's legal entitlement to seek government jobs, benefits, and licenses, qualify as "other government action adversely affecting the plaintiff's interest," all that Fikre must show is a "tangible burden" on the "ability to obtain a right or status." *Humphries*, 554 F.3d at 1188. In order to make this showing, it is enough for Fikre to show an "indicium of material government involvement unique to the government's public role that distinguishes his or her claim from a traditional state-law defamation suit." *Doe*, 271 F. 3d at 55; *see also Suarez Corp. Industries v. McGraw,* 202 F.3d 676, 688 n.14 (4th Cir. 2000) ("defamatory statements" are "actionable" when "accompanied by a harm to a more tangible interest"). The "other government action" is simply "non-trivial state involvement that removes the plaintiff's complaint from the realm of traditional state-law

defamation." *Doe,* 271 F. 3d at 55. There is no "threshold of substantiality" requirement." *Id.* As the Supreme Court put it in *Siegert,* the plus must be something beyond "damage flow[ing] from injury caused by the defendant to a plaintiff's reputation." *Siegert v. Gilley,* 500 U.S. 226, 234 (1991).

Here, Fikre's watchlist placement alone facially meets this standard. Placement results in an array of changes in status and other legal consequences.

First are the effects on Fikre's ability to travel. Fikre went from being treated like any other traveler to being subject to consistent searches, seizures, and enhances screenings. ER-32 at ¶ 35. For years, the Government denied him the right to board an airplane—depriving him of the means to exercise his rights to interstate and international travel. *See Latif ,* 28 F. Supp. 3d at 1150 ("the Court concludes Plaintiffs have satisfied the "plus" prong because being on the No–Fly List means Plaintiffs are legally barred from traveling by air at least to and from the United States and over United States airspace, which they would be able to do but for their inclusion on the No–Fly List.")

Fikre also became subject to search, seizure, and downloading of electronic devices at the border. *Id.*; CBP Directive 3340-049A § 5.1.4; *see also Tebo*, 550 F.3d at 504 (loss of constitutional right qualifies); *Clark*, 890 F.2d at 619 (same).

Second is the transmission of Fikre's status as a "known or suspected terrorist" to police and other law enforcement officials. This is sent, along with a handling code, to various law enforcement and other officials. ER-32 at ¶ 35[3] *See Elhady,* 391 F. Supp. 3d 562 at 580 ("placement on the TSDB triggers an understandable response by law enforcement in even the most routine encounters with someone on the Watchlist that substantially increases the risk faced by that individual from the encounter.").

Fikre has, of course, suffered from these travel and law enforcement consequences. ER-46-47 at ¶ 96; 47 at ¶ 98; 49 at ¶¶ 101-102; 52-59 at ¶¶ 114-147. But even if he had not, this is irrelevant. The test for determining constitutional injury requires a stigmatizing dissemination and a change in legal status. It does not require stigmatizing dissemination,

---

[3] There are also immigration, licensing, and banking consequences, though Fikre has not alleged any here. *See El Ali v. Barr,* 473 F. Supp. 3d 479, 497, 511 (D. Md. 2020).

change in legal status, and then additional injury resulting from the change in legal status. *See Natl. Council of Resistance of Iran v. Dept. of State*, 251 F.3d 192, 204 (D.C. Cir. 2001) (allegation that organization's bank accounts now at risk of cancellation or revocation enough).

## 2. The watchlist altered Fikre's status in concrete ways.

Even beyond the change in status and the corresponding loss of constitutional rights (including Fourth Amendment rights), the extent of "other government action" is omnipresent. The watchlist inflicts an array of legal consequences that separately and in the aggregate amount to a change in legal status. And Fikre suffered them in particular and unique ways. He has been tortured, denied the ability to fly outright, had his private communications intercepted, been arrested and indicted, and has been denied the ability to participate in the religious commandment of *hajj*. These are all concrete "tangible burden[s]" on Fikre's "ability to obtain a right or status." *Humphries,* 554 F.3d at 1188. Fikre is not simply bringing a defamation claim, attempting to turn the Due Process clause the due into a "font of tort law." *Paul*, 424 U.S. at 701. His stigma plus claim—which the District Court correctly ruled is not moot, ER-6-7, should proceed.

### 3. Fikre has met any required connection between the stigma and the loss of status

The District Court does not appear to dispute that Fikre has suffered a change in right or status based on his watchlist placement. Rather, the District Court dismissed Fikre's stigma-plus claim because it found "Fikre has failed to plead that his 2016 reputational injury occurred in connection with the denial or alteration of a right." ER-8.

Respectfully, this is in error. *Humphries* does not create any such requirement of a causal connection between the stigmatizing injury and the change in right or status. Rather, *Humphries* simply requires that "as the result of" the stigmatizing conduct, "a right or status previously recognized by state law was distinctly altered or extinguished." *Humphries*, 554 F.3d at 1188 (quoting in part *Paul*, 424 U.S. at 711). After all, the stigma plus-test was not designed to ensure that any public stigma would be status altering, but that the Government be protected from being sued for constitutional violations for mere defamation." *Paul*, 424 U.S. at 701. Here, there is no question Fikre was both stigmatized by his watchlist placement and that his watchlist placement changed his rights or status, including by torture, arrest, and inability to fly.

39

The District Court's further requirement that the stigmatization it-self cause the change in right or status is contrary to law. Stigma-plus cases have allowed claims against public employers, for example, when an employee is dismissed from public employment and the reasons for discharge "impair[] a reputation for honesty or morality." *Matthews v. Harney County, Or., Sch. Dist. No.* 4, 819 F.2d 889, 891–92 (9th Cir. 1987) (citing *Jones v. Los Angeles Community College Dist.*, 702 F.2d 203, 206 (9th Cir.1983). All that is needed is that (1) "the accuracy of the charge is contested; (2) there is some public disclosure of the charge; and (3) the charge is made in connection" with the Government's adverse action. *Id.* The result of the stigmatization, in contrast, need not satisfy a plus fac-tor. It must merely be, well, stigmatizing.

Even if the change of status must be caused by the stigmatization, Fikre still meets this test. Fikre has been stigmatized every time his ter-rorist designation has been disclosed to airlines, foreign governments, prosecutors, FBI officials, and border security. ER-51-52 at ¶ 112; 58-59 at ¶ 143; 60 at ¶ 150; 61 at ¶ 159; 62-63 at ¶ 169. And those disclosures themselves have changed his rights or status during those encounters. If the plus must be a change in right or status caused by a stigmatizing

40

transmission accusing Fikre of being a terrorist, these all qualify as stig-matizing transmissions changing a right or status.

Perhaps the District Court was suggesting that the stigmatizing disclosure must be to a nongovernmental entity ***and*** the result of that public dissemination must cause a change in right or status. This would limit the stigma-plus test to changes in status imposed solely by private entities. No case stands for such a position which would narrow stigma-plus doctrine so significantly. But even if that were the law, Fikre's watchlist status has been transmitted to airlines, who have consequently denied him boarding on their planes. ER-29 at ¶¶ 9-10; 45 at ¶ 89; 46 at ¶ 93; 53 at ¶ 118; 54 at ¶ 123. This alone is enough under *Humphries*, even under the District Court's mistaken interpretation of that case.

## CONCLUSION

This court's opinion in the prior *Fikre* appeal outlines the steps and requirements necessary to address plaintiff's claims and grievances which will in turn moot the case and preclude the possibility for further relief. The Government has not followed those steps. The Government's non-binding and non-repudiating declaration is of no real relevance and is insufficient under this Circuit's prior opinion.

As this Court previously explained, if the Government wants to moot this case, it must explain the reasons for dropping Fikre from the No Fly List and repudiate the decision to add Fikre to the No Fly List and maintain him there for approximately five years. It has not done so.

Meanwhile, the stigma-plus claim remains valid for much the same reasons the Eastern District of Virginia has found the TSDB unconstitutional in *Elhady*.

The Court of Appeals should reverse the District Court's dismissals of both Fikre's travel-related claims and Fikre's stigma-plus claims.

### APPELLANT REQUESTS ORAL ARGUMENT.

Respectfully submitted,

March 26, 2021

/s/ Lena F. Masri
Lena F. Masri
Gadeir I. Abbas
Justin Sadowsky
CAIR LEGAL DEFENSE FUND
453 New Jersey Ave. SE
Washington, DC 20003
(202) 742-6420
*Counsel for Yonas Fikre*

*Gadeir I. Abbas licensed to practice in Virginia only. Practice limited to federal matters.*

42

## CERTIFICATE OF COMPLIANCE

This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this brief or other document contains 8,530 words.

This complies with the typeface and type style requirements because this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Lena F. Masri
Lena F. Masri

*Counsel for Yonas Fikre*

43